In the

# United States Court of Appeals
## For the Seventh Circuit

No. 05-2205

EVAN S. HULL,

*Plaintiff-Appellant,*

*v.*

STOUGHTON TRAILERS, LLC,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Western District of Wiconsin.
No. 04-C-0721-S—**John C. Shabaz**, *Judge.*

ARGUED JANUARY 4, 2006—DECIDED APRIL 26, 2006

Before POSNER, EVANS, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Stoughton Trailers ("Stoughton") fired Evan Hull ("Hull") shortly after he completed an approved one-week leave under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.* (2000), and while he was requesting additional FMLA leave. Despite Hull's claims that Stoughton impermissibly fired him because he requested FMLA leave, the district court granted summary judgment in favor of Stoughton. We affirm, not on the grounds relied on by the district court, but rather because Hull failed to establish his prima facie burden of showing that similarly situated employees who did not take FMLA leave were treated more favorably.

## I. BACKGROUND

Hull worked as an assembly line supervisor at Stoughton, a Wisconsin manufacturing facility that fabricates and assembles trailers, containers, and chassis for use with large trucks. In Fall of 2003, Hull had a flare-up of a lower back condition and consulted his doctor, an orthopedic specialist. On October 8, 2003, Hull's doctor prescribed diazepam (commonly known as Valium) and hydrocodone (an opiate) for pain relief. Both of these medications have side effects that include drowsiness and, at higher doses, confusion and even delirium. Hull regularly took these medications with his breakfast at approximately 4:30 a.m. and would then travel to Stoughton's Brodhead, Wisconsin facility, where his shift routinely began at 6 a.m.

On November 3, 2003, Hull met with Barb Patterson ("Patterson"), Stoughton's Human Resource Administrator, and reported that he had a ruptured disc in his back. Hull requested that Patterson begin paperwork for a possible FMLA leave. Hull also discussed his medication regimen with Linda Lewis, Stoughton's company nurse, who purportedly told Hull that his plan of taking the medications at approximately 4:30 a.m. was medically sound.[1]

On the morning of November 10, 2003, one of Hull's co-workers noticed that he looked impaired: Hull's speech was slurred and he appeared confused and drowsy. Contrary to standard company policy, Stoughton personnel did not administer a drug test. Instead, Stoughton requested that Hull leave work, which he promptly did. That same day, Hull's physician placed Hull on a one-week medical leave. On November 12, 2003, Stoughton approved the one-week leave, effective November 11, 2003.

---

[1] The parties disagree about the exact contours of this conversation, but the differences do not affect the outcome here.

On November 17, Hull's physician placed him on an additional two-week leave. That same day (or the day after—the parties, again, disagree), Hull notified Stoughton's Human Resources department that his FMLA leave would need to be extended by two weeks. Unbeknownst to Hull, around this same time, his immediate supervisor, Robert Wahlin, and Stoughton's General Manager, Bradford Alfery ("Alfery"), were conferring to discuss terminating Hull, purportedly for his violation of the company's drug policy and ongoing performance problems. (Hull had received a new work assignment in August 2003, following prior unfavorable reviews in October 2002 and June 2003, but he completed a 45-day initial review period in September 2003, with no indication of continuing performance issues.)

On November 20, 2003, Stoughton terminated Hull, with a retroactive effective date of November 18, 2003. The termination notice to Hull from Alfery, the company decision-maker, stated, in pertinent part:

> The Company has determined that you failed to comply with [Stoughton's Drug and Alcohol policy and the Code of Ethics]. By itself, this event is enough to terminate your employment and in light of your previous poor performance, decision making, and your failure to meet the performance improvement expectations as mutually agreed, your immediate termination of employment with the Company is necessary.

Hull filed a lawsuit in Wisconsin state court, alleging that Stoughton retaliated and discriminated against him for taking FMLA leave. Stoughton removed the case to federal court. After the parties conducted significant discovery, Stoughton filed a motion for summary judgment. The district court granted Stoughton's motion for summary judgment, holding that Hull could not establish that Alfery,

the decision-maker, knew that Hull had taken FMLA leave prior to the decision to terminate him. As a result, the district court concluded that Hull could not establish a "causal relationship" between the protected activity (taking FMLA leave) and his firing. The district court further held that even if Hull could establish a prima facie case, Hull could not establish that Stoughton's proferred reasons for the termination were pretextual.

## II.  ANALYSIS

The district court's principal reason for granting summary judgment was that Hull could not establish that Alfery, the decision-maker, was aware that Hull had requested FMLA leave, and therefore Hull could not establish a "causal relationship" between the protected activity and the adverse action. This court, however, no longer requires the type of causal link that the district court found to be lacking in this case. *See Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 643-44 (7th Cir. 2002). Instead, to establish an FMLA retaliation or discrimination case under the indirect method (which is the case that Hull brings here), Hull must show that after taking FMLA leave (the protected activity) he was treated less favorably than other similarly situated employees who did not take FMLA leave, even though he was performing his job in a satisfactory manner. *See id.*; *see also Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004).

On appeal, Stoughton does not dispute that the district court's basis for granting summary judgment was incorrect. Instead, Stoughton argues that Hull cannot meet his prima facie requirement of showing that similarly situated employees who did not take FLMA leave were treated more favorably than Hull. Because this court can affirm summary judgment on any ground found in the record, we consider this argument. *See Box v. A & P Tea Co.,* 772 F.2d 1372,

1376 (7th Cir. 1985). Hull's evidence on the similarly situated requirement is thin: it consists of a spreadsheet showing that over the course of ten years, eighty-five of Stoughton's employees were disciplined for violating Stoughton's drug use policy, but only three non-probationary employees (like Hull) were discharged for first-time violations of the policy. Furthermore, there were additional grounds (such as manipulating urine samples) that independently justified discharging these three employees. Although this evidence establishes that Hull was likely punished with greater severity than virtually any other first-time violator of Stoughton's drug and alcohol policy, it does not satisfy this court's requirement for establishing a similarly situated comparator group. Specifically, Hull fails to show that at least one of these other Stoughton employees (the comparators) is directly comparable to him <u>and</u> did not take FMLA leave.

"To determine whether two employees are directly comparable, a court looks at all the relevant factors, which most often include whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications—provided the employer considered these latter factors in making the personnel decision." *Ajayi v. Aramark Bus. Servs., Inc.*, 336 F.3d 520, 532 (7th Cir. 2003); *see also Radue v. Kimberly-Clark Corp.,* 219 F.3d 612, 617-19 (7th Cir. 2000); *Buie*, 366 F.3d at 508. Although the similarly situated requirements should not be applied mechanically or inflexibly, Hull here fails to present *any* evidence that would allow a meaningful comparison between the circumstances of his discharge and those surrounding the discipline meted out to his would-be comparators. For instance, Hull's evidence lacks any information pertaining to the job duties of the comparators, the supervisor(s) involved in the comparators' discipline, and whether any of the compara-

tors had job performance histories somewhat comparable to Hull's. On a more fundamental level, Hull fails to present any evidence on the critical independent variable here: FMLA leave (*i.e.*, which comparators did (or did not) take FMLA leave). And there was no indication from Hull's counsel at oral argument that this type of information was not readily available through conventional discovery methods. Hull's failure to provide even rudimentary data on comparators is glaring because Stoughton's purported treatment of first-time violators of its drug policy is the *only* circumstantial evidence (aside from suspicious timing, which almost never carries the day alone, *see Stone*, 281 F.3d at 644) that Hull provides to allow a jury to infer discrimination. Thus, without meaningful comparison data, there simply is not enough circumstantial evidence from which a reasonable jury could conclude that Stoughton fired Hull because he took FMLA leave, rather than because of a myriad of other permissible (even if distasteful) reasons, which run the gamut from personal animus to sheer employer whim.

Hull argues that comparator data is unnecessary because, in his view, under "Stoughton's consistent and unvarying enforcement of the Policy *it doesn't matter* who your supervisor is; *it doesn't matter* what position you hold; *it doesn't matter* what your job qualifications are; *it doesn't matter* whether your prior job performance has been good or bad." (App. Br. at 2) (emphasis in original). Instead, all that matters is that Hull's alleged drug violation was of comparable seriousness to other employee offenders.

This argument runs squarely against well-established case law in this circuit. *See, e.g.*, *Stone*, 281 F.3d at 643-44. Hull's sole authority for his novel position is this court's decision in *Cherry v. AT&T Co.*, 47 F.3d 225 (7th Cir. 1995). But *Cherry* certainly does not stand for the broad proposition that an employer's invocation of a policy as justification for an adverse employment action voids the typical require-

ment of a plaintiff showing similarly situated comparators. *Cherry* merely noted that in certain limited circumstances this court may look to an underlying discriminatory policy that targets only protected class members as a method to expand the range of comparison employees. *Id.* at 229, *citing McNabola v. Chicago Transit Authority,* 10 F.3d 501 (7th Cir. 1993). For instance, the Cherry court cited the *McNabola* decision, where the class of similarly situated employees was expanded to include *per diem* attorneys because the plaintiff there was the only *per diem* medical officer hired by the defendant, and, as the *McNabola* court noted, "a defendant should not be insulated from liability under the equal protection clause merely because it utilizes only a limited number of *per diem* medical examiners." *McNabola*, 10 F.3d at 514. In contrast, Hull does not contend that there was anything unique about his job duties or that data on comparator employees was somehow unavailable. He also does not suggest that there was a company-wide discriminatory policy that targeted only members of a protected class (nor could Hull make such an argument, in light of the fact that he did not determine which of the past violators of Stoughton's drug policy had requested or taken FMLA leave).

Hull's argument is contradictory because his only potential winning argument cannot depend on Stoughton's "consistent and invarying enforcement of the Policy." It depends on precisely the opposite. That is, Hull must show that Stoughton does *not* apply its drug and alcohol policy in a consistent or invariable fashion, blind to FMLA status, but rather, at least with respect to him, Stoughton selectively enforces its policy in accordance with its alleged disdain for workers who request or take FMLA leave. That, once again, leads back to the necessity of providing additional descriptive data about respective FMLA leaves, supervisors, job duties, performance histories, and so forth—none of which Hull presented to the district court.

As a final note, we observe that Hull's complaint contains a bare allegation that "[i]n terminating Hull, Stoughton unlawfully interfered with Hull's attempt to exercise rights protected by the Act." These words might provide a claim of improper interference with FMLA rights, which is a claim that is not only more squarely in-line with the facts of this case, but would also evade the evidentiary hurdles that doomed Hull's discrimination/ retaliation claim. *See Kauffman v. Federal Express Corp.*, 426 F.3d 880, 884-85 (7th Cir. 2005) (distinguishing the requirements between FMLA discrimination and interference claims). Hull's counsel, however, assured us at oral argument that he did not pursue an interference claim in this litigation, and, as plaintiffs are, of course, free to pursue whichever avenues of recovery they choose, we do not delve further into this potential claim.

## III.  CONCLUSION

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment in favor of defendant.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*

USCA-02-C-0072—4-26-06